AO 91 (Rev. 11/11)  Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT
2/7/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CDO___ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
2/7/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___eq___ DEPUTY

United States of America

v.

Bakhtiyar Kamardinov,

Defendant

Case No.  2:24-mj-00726-DUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 23, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(4) | Possession of Device-Making Equipment |

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
_____
Complainant's signature

Ivan Anguiano, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/7/2024

[signature]
_____
Judge's signature

City and state: Los Angeles, California

Hon. Rozella A. Oliver, U.S. Magistrate Judge
*Printed name and title*

AUSA: Sarah E. Spielberger (x3358)

## AFFIDAVIT

I, Ivan Anguiano, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Bakhtiyar KAMARDINOV ("KAMARDINOV") for a violation of Title 18, United States Code, Section 1029(a)(4), Possession of Device-Making Equipment.

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. BACKGROUND OF SPECIAL AGENT IVAN ANGUIANO

3. I am a Special Agent with the United States Department of Labor Office of Inspector General ("DOL-OIG"), and have served in this capacity since November 2021. I am presently assigned to the Los Angeles Regional Office. My responsibilities as a DOL-OIG Special Agent include investigating unemployment insurance fraud, mail fraud, identity theft, as well as other related crimes.

4.   I have been employed as a Special Agent with the DOL OIG since November 2021.  I have received approximately 12 weeks of instruction in the fundamentals of law, ethics, interviewing, report writing, firearms, surveillance, defensive tactics, and case management at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have received numerous hours of additional training pertaining to the aforementioned topics while on the job and through agency specific training programs.

5.   I have received instruction in the identification, collection, and preservation of evidence, photography, and fingerprint collection.  I have completed hundreds of hours of criminal investigations, including compiling information, interviewing victims, witnesses and suspects, and collecting evidence.

6.   Through the course of my employment with the DOL OIG, my primary responsibility is to investigate allegations of criminal, civil, and administrative misconduct involving DOL employees, contractors, grantees, and programs, including, but not limited to, bribery and corruption, financial crimes, theft of government property, investigating unemployment insurance fraud, mail fraud, identity theft, as well as other related crimes.

7.   Prior to joining the DOL OIG, I was an investigator for the U.S. Department of Labor, Office of Labor-Management Standards, in Los Angeles, California, from April 2019 to November 2021, where I was responsible for investigating labor unions using analytical techniques including conducting

financial audits, interviews, and document analysis to enforce embezzlements in violation of Title 18 and 29 of the United States Code.

### III.  SUMMARY OF PROBABLE CAUSE

8.   On February 23, 2022, a witness reported to Signal Hill Police Department ("SHPD") officers that a man later identified as KAMARDINOV was engaging in suspicious activity at Bank of America automated teller machines ("ATMs") located at 981 East Spring Street in Signal Hill, California (the "East Spring Street Address").  According to the witness, KAMARDINOV was withdrawing money from two ATM machines and inserting multiple cards into the ATM machines.

9.   Officers arrived at the East Spring Street Address and detained KAMARDINOV, whom the witness confirmed was the man engaging in the suspicious ATM activity.  Officers searched KAMARDINOV and found a cellphone, twelve cloned cards with PIN numbers written on the back, a metal skimming device, two Bank of America ATM receipts totaling $2,000 corresponding to withdrawals made minutes earlier, $2,000 in cash, and a Volvo key fob.

10.  Officers pressed the emergency button on the Volvo key fob, which activated the car alarm on a blue 2021 Volvo XC90, bearing California License Plate XJW608 (the "Volvo") parked near the Bank of America ATMs.  Officers searched the Volvo pursuant to a state search warrant and found 25 digital devices, hundreds of cloned cards with personal identification numbers

("PINs") written on the back, 11 metal skimming devices, nine pin-hole cameras, bank receipts, and $4,918.60 in cash.

11. I later obtained a search warrant to search the 26 digital devices. These devices contained, among other things, spreadsheets of hundreds of possible Bank of America account numbers, text messages showing KAMARDINOV discussing ATM skimming with others, and video footage of KAMARDINOV installing an ATM card skimmer onto an ATM machine.

12. An analysis of the recovered cards revealed that 133 of the cards were cloned Employment Development Department ("EDD cards") containing account numbers belonging to persons other than defendant KAMARDINOV.

13. Bank records and surveillance footage confirmed that KAMARDINOV engaged in bank and access device fraud against vulnerable Californians receiving EDD benefits. For example, on February 23, 2022, KAMARDINOV fraudulently accessed two Bank of America debit card accounts issued to EDD benefits recipients, withdrawing money from both accounts. Bank of America records revealed that between December 1, 2021, and February 23, 2022, there were approximately $52,810 in fraudulent withdrawals made on the accounts corresponding to the 133 cloned EDD cards.

## IV. STATEMENT OF PROBABLE CAUSE

14. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.     Regulatory Background of the EDD Program

15.  California's Employment Development Department ("EDD") distributes administers unemployment insurance, disability insurance, and paid family leave programs.

16.  These benefits are issued through Electronic Development Department cards.  EDD cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions.  For example, you can use an EDD card to make a purchase at a grocery or convenient store by swiping the card at a point-of-sale terminal.

17.  The EDD cards are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card. Bank of America administers the EDD programs. Benefits received through the programs are typically disbursed to cardholders during the early days of the month.  Those benefits are deposited directly into the account of the EDD cardholder.

18.  The cardholders can then conduct cash withdrawals at ATMs using a PIN established by the card holder.  The EDD cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by EDD intended for beneficiaries of their programs.

**B.   Background on EDD Fraud in the Los Angeles Area and Prior State and Federal Operations**

19.  Based on my training and experience and conversations with law enforcement, I am aware of the following.

20.  Since in or about August 2022, federal, state, and local law enforcement have been working to investigate a significant increase in unauthorized cash withdrawals utilizing EDD cards.  Based on analysis of victim complaints to federal and local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

21.  A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the EDD benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

22.  On a legitimate debit or credit card, the information coded on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's name, among other information.  Whereas on a cloned card, the information coded on the magnetic stripe will not match the information embossed on the front of the card.  For example, if

a suspect re-encodes victim EDD card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be coded with the EDD card information, but the card itself will still bear the information of the gift card or bear no information if it is a blank white plastic card.

23. Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

24. The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals.

25. For example, individuals conducting ATM "skimming" may install a metal skimming device into the card reader of the ATM to record the debit or credit card numbers. In addition to the card reader, fraudsters will install another device to obtain the PIN associated with each account. This device is often a covert camera, called a pinhole camera, that captures customers entering their PINs.

26. Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

7

27. As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming. Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

  **C. On February 23, 2022, a Witness Observed KAMARDINOV Engaging in Suspicious Activity at Bank of America ATMs**

28. Based on my review of a SHPD arrest report, body camera recordings, search warrants, and conversations with SHPD officers, I know the following:

  a. On February 23, 2022, at around 1:53 p.m., SHPD received a call from a witness about suspicious activity at Bank of America ATM machines located at the East Spring Street Address.

  b. The witness said that a man was going back and forth between two ATM machines, inserting multiple cards into the ATM machines, and withdrawing money. The witness described the man as a 5'10, Hispanic-looking, and wearing a gray baseball hat, black vest, and white shirt. The witness said that the man was now walking northbound through the parking lot toward a Dollar Tree store.

  c. SHPD dispatch officers told the witness to remain on the line while they sent officers to respond to the situation.

   d. SHPD Sergeant Hefte arrived at the East Spring Street Address at around 1:58 p.m.  SHPD approached a man in the parking lot who matched the description provided by the witness, later identified as KAMARDINOV.  The witness, who was still on the line with SHPD Dispatch, confirmed that Sergeant Hefte had approached the man whom the witness had seen engaging in the suspicious ATM activity.

   e. Later, an officer met the witness in person. The witness confirmed that SHPD officers detained the individual that the witness saw at the ATMs.

  **D. Officers Searched KAMARDINOV and Found a Cellphone, Cloned EDD Cards, ATM Receipts, a Card Skimmer Device, Cash, and a Volvo Key Fob**

  29. Based on my review of a SHPD arrest report, body camera recordings, photographs, search warrants, conversations with SHPD officers, I am aware that officers searched KAMARDINOV's person and found:

   a. A cellphone;

   b. Approximately 12 blank gift cards, 11 of which I later analyzed and learned were cloned EDD cards, each bearing a small sticker with four numbers that appeared to be victim PINs;

   c. A metal card skimmer device;

   d. Approximately $2,000 in cash;

   e. Two Bank of America ATM withdrawal receipts for $1,000 each, bearing timestamps 1:48 p.m. and 1:49 p.m. on February 23, 2022; and

   f. A Volvo key FOB.

30. Based on my training, experience, and conversations with other agents, I believe that the items found on KAMARDINOV's person are implements of access device fraud, and that the metal card skimmer device is access device-making equipment. I believe this for the following reasons:

   a. Individuals who are engaged in access device fraud will install card skimmer devices like the one found on KAMARDINOV's person at walk-up or drive-through ATM terminals. These card readers, which are typically thin enough to go unnoticed to a lay person using an ATM, will capture account numbers from cards inserted into an ATM.

   b. In addition to the card reader, fraudsters will install another device to obtain the PIN associated with each account. This device is often a covert camera like the one later found in KAMARDINOV's vehicle, and is called a pinhole camera, that captures customers entering their PINs.

   c. An ATM skimming device is typically installed for a specified time period, after which the subjects who installed the device will return to the ATM and remove it. Once the device is removed, the customer credit card numbers and PINs are retrieved from the device.

   d. From there, fraudsters will create what are known as a cloned cards by loading the stolen account numbers captured by the card skimmer onto blank cards such as the ones found on KAMARDINOV's person. Cloning a card allows the fraudster to use the card and the benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

   e. Fraudsters may document the PINs associated with each card in various ways, including by affixing stickers bearing the PINs onto the cards, such as the ones found on the blank cards in KAMARDINOV's possession.

   f. Fraudsters will travel to ATMs with the cloned cards and PINs in order to fraudulently withdraw funds from the victim customer accounts.

   g. It is common for thieves using ATM skimmers to withdraw funds in consecutive transactions, minutes or seconds apart, in order to obtain as much cash as possible on a single trip the ATM.  Fraudsters who do so may have in their possession ATM withdrawal receipts such as the ones found on KAMARDINOV's person.

 31. Based on my review of the SHPD report and conversations with law enforcement I am aware of the following:

   a. KAMARDINOV was charged with a violation of Florida Statute section 784.041(2)(a), domestic battery by strangulation, a third degree felony, on September 27, 2018. KAMARDINOV failed to appear in Florida court as ordered, and the court issued an extraditable bench warrant for his arrest.

   b. SHPD learned that KAMARDINOV had this bench warrant at the time SHPD arrested him in Signal Hill. KAMARDINOV was transferred into Florida state custody.

11

**E.   Officers Searched the Volvo and Found 26 Digital Devices, Blank Cards, Card Skimmers, Pin-Hole Cameras, Cash, and Bank Receipts**

32.  Based on my review of a SHPD arrest report, bodycam recordings, photographs, search warrants, and conversations with SHPD officers, I know the following:

   a.   On February 23, 2022, SHPD officers pressed the emergency button on the key fob they found on KAMARDINOV, and the horn of the Volvo activated in response.  The Volvo was parked near the Bank of America ATMs.

   b.   Officers walked to the Volvo.  Through the windows, officers could see two backpacks, a laptop, a hard case luggage bag, and cash.

   c.   On February 24, 2022, the Honorable Laura Laescke, Los Angeles County Superior Court Magistrate Judge, issued a warrant to search the Volvo.

   d.   That same day, SHPD officers executed the search warrant for the Volvo.  Officers found and seized the following:

   i.   25 digital devices, including four cellphones, two laptops, 18 micro SD cards, and a portable storage drive;

   ii.  144 cloned cards bearing stickers with suspected PIN numbers;

   iii. 51 blank cards without PINs;

   iv.  Nine pin-hole cameras;

   v.   Eleven metal card skimmers;

      vi.   Miscellaneous material for making skimmers and pin-hole cameras, as well as readers and portable battery chargers;

      vii.  $4,918.60 in cash;

      viii.  14 bank receipts;

      ix.  Various documents in KAMARDINOV's name; and

      x.  One Glock 19 BB gun.

33. Based on my training and experience, I believe that the eleven metal card skimmers found in KAMARDINOV's car are device-making equipment for the same reasons described above.

### F.  Bank of America Confirmed that KAMARDINOV Used the ATMs at the East Spring Street Address on February 23, 2022, Skimmed ATMs from December 1, 2021, until February 23, 2022, and that the Cloned Cards Did Not Belong to Him

34. I analyzed the cards recovered on KAMARDINOV's person and in his vehicle and determined that there were 133 cards cloned with EDD Bank of America account numbers. Based on my review of Bank of America bank records, I am aware that none of these accounts belonged to KAMARDINOV.

35. Based on my review of Bank of America bank records, Bank of America ATM surveillance footage, and conversations with a Bank of America representative, I am aware of the following:

    a.  Bank of America surveillance photographs and records show that on February 23, 2022, at about 1:48 p.m., KAMARDINOV accessed an EDD account ending in 1507 belonging to J.C. and withdrew $1,000.

    b.  Bank of America surveillance photographs and records also show that on February 23, 2022, at about 1:49 p.m.,

KAMARDINOV accessed an EDD account ending in 1752 belonging to S.S. and withdrew $1,000.

      c.   Prior to both withdrawals, KAMARDINOV conducted balance inquiry checks on both EDD accounts.

      d.   The surveillance photographs match a Florida DMV photograph of KAMARDINOV and match KAMARDINOV's appearance at the time of his arrest.




36.  I later interviewed victim S.S., the rightful owner of the EDD card ending in 1752, who stated that he did not give anyone permission to be in possession of his EDD card information or to utilize his EDD card information to withdraw funds.

37.  I later interviewed victim J.C., the rightful owner of the EDD card ending in 1507, who stated that he did not give anyone permission to be in possession of his EDD card information or to utilize his EDD card information to withdraw funds.

38.  Based on my review of Bank of America bank records and conversations with a Bank of America representative, I am aware that Bank of America analyzed the 133 cloned EDD cards that SHPD found on KAMARDINOV and in his vehicle. Bank of America determined that, from approximately December 1, 2021 to February 23, 2022, there were approximately $52,810 in fraudulent withdrawals on these cards at ATM terminals located at the East Spring Street location and in Long Beach, Los Angeles, Sunland, La Crescenta, and Burbank.

### G.  A Review of KAMARDINOV's Digital Devices Shows Additional Evidence of ATM Skimming

39.  On September 12, 2022, the Honorable Charles Eick, United States Magistrate Judge, signed a warrant in case number 2:22-MJ-3622 authorizing the search of the 26 digital devices recovered.

40.  I reviewed the digital devices and found the following relevant evidence:

   a.  Spreadsheets containing hundreds of what I believe to be Bank of America account numbers[1];

   b.  Video footage of KAMARDINOV installing a metal card skimmer onto an ATM machine;

   c.  Pin-hole camera footage that was installed at several ATMs showing individuals using the ATM machines;

---

[1] I believe that these are Bank of America account numbers because they all start with the number "44" and contain 16 digits. I know, based on my training and experience, that Bank of America account numbers follow this numerical pattern.

15

        d.    Text messages between KAMARDINOV and others discussing ATM skimming and sharing photographs of ATMs and ATM card skimmers;

        e.    Multiple identification cards belonging to other people like drivers' licenses from several states, a social security card, and a United States passport; and

        f.    A photograph of a United States passport with KAMARDINOV's photograph but another person's name.

## V. TRAINING AND EXPERIENCE REGARDING BANK FRAUD, IDENTITY THEFT, ACCESS DEVICE FRAUD, AND POSSESSION OF ACCESS DEVICE-MAKING EQUIPMENT

41.    Based on my training and experience and information obtained from other law enforcement officers who investigate bank fraud, access device fraud, access device-making equipment crimes, and identity theft, I know the following:

        a.    People involved in bank fraud, identity theft, access device fraud, and possession of device-making equipment crimes often collect checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates of birth), and identification documents belonging to other people that they can use to fraudulently obtain money and items of value.  It is a common practice for those involved in such crimes to use either false identification or stolen real identification to make purchases with stolen access devices at in order to avoid detection and to complete the transaction.  Those who engage in such fraud keep evidence of such fraudulent transactions.

b. It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, possession of access-device making equipment, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers like the ones found on KAMARDINOV and in his vehicle to read and re-encode credit cards. It is also common for these fraudsters to install pinhole cameras at ATMS in order to surreptitiously record their victims inputting their PIN numbers. Software relevant to such schemes can often be found on digital devices, such as computers. Such equipment and software are often found in the thieves' possession as they can be small and easily portable.

c. It is also common for identity thieves, and individuals engaged in bank fraud, access device fraud, possession of access-device making equipment, and identification document fraud to keep "profiles" of victims on their digital devices. Such "profiles" contain the personal identifying information of victims, such as names, account numbers, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers. As seen in the case of KAMARDINOV, these thieves may keep victim account information in spreadsheets on digital devices in order

17

to keep track of the accounts they are making fraudulent ATM withdrawals from.

        d.   It is common practice for individuals involved in identity theft, bank fraud, possession of device-making equipment, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; (6) verifying the status of stolen access devices; and (7) coordinating with co-conspirators.

        e.   Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-

conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. As seen in the case of KAMARDINOV, suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## VI. CONCLUSION

42. For all of the reasons described above, there is probable cause to believe that KAMARDINOV has committed a violation of 18 U.S.C. § 1029(a)(4) (possession of access device-making equipment).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  7th  day of
February, 2024.

_____
THE HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE